COMMUNICATIONS SATELLITE CORPORATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Teleport International Limited, American Satellite Company, American Telephone & Telegraph Company, Jamaica National Investment Promotion Limited, Intervenors.

No. 86–1669.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 6, 1987.

Decided Jan. 12, 1988.

Sally Katzen, with whom Warren Y. Zeger, Washington, D.C., and Keith H. Fagan, were on the brief, for petitioner. John S. Hannon, Clarksburg, Md., also entered an appearance for petitioner.

John E. Ingle, Deputy Associate General Counsel, FCC, with whom Diane S. Killory, General Counsel, FCC, Daniel M. Armstrong, Associate General Counsel, FCC, John J. Powers, Atty., U.S. Dept. of Justice, Laura Heiser, U.S. Dept. of Justice, and Laurel R. Bergold, Counsel, FCC, Washington, D.C., were on the brief, for respondents. Linda L. Oliver, Counsel, FCC, Washington, D.C., also entered an appearance for respondents.

Sharon C. Pavlos, Rockville, Md., was on the brief for intervenors, American Satellite Co. and Teleport Intern. Ltd.

Keith E. McClintock and M.A. Donnella, Basking Ridges, N.J., entered appearances for intervenor American Telephone and Telegraph Co.

David H. Baker, Washington, D.C., entered an appearance for intervenor Jamaica Nat. Inv. Promotion Ltd.

Before WALD, Chief Judge,
EDWARDS and SILBERMAN, Circuit Judges.

Opinion for the Court filed by
Circuit Judge HARRY T. EDWARDS.

Concurring opinion filed by Circuit Judge SILBERMAN.

HARRY T. EDWARDS, Circuit Judge:

The Communications Satellite Corporation ("Comsat") has petitioned for review of an order entered by the Federal Communications Commission ("FCC" or the "Commission") under section 214 of the Communications Act, 47 U.S.C. § 214 (1982), which authorizes Teleport International, Ltd. ("Teleport") and American Satellite Company ("ASC") to use domestic satellite facilities to provide international telecommunications services between the United States and Jamaica. While applicable law, treaty obligations and FCC precedent generally require that international communications be routed through the International Telecommunications Satellite Organization ("In-

telsat") and its domestic affiliate Comsat, the FCC approved the Teleport/ASC application in reliance on its previously established "transborder policy." That exception to the general rule permits operators of satellites used for domestic communications to provide services to foreign points within the satellite's coverage area ("footprint") in cases where the Intelsat system could not provide the service or where it would be "uneconomical or impractical" for it to do so.

We find that, contrary to the position advanced by Comsat, the Teleport/ASC application was properly considered under the transborder policy. It is not an unfair reading of the Commission's precedent to apply the transborder policy whenever the proposed service is incidental to a domestic *satellite;* it need not be incidental to an existing domestic *service* to fall within the scope of the transborder policy. Furthermore, the Commission's subsequently adopted "separate systems" policy in no way altered the transborder policy, so "separate systems" considerations have no application to this case.

The Commission did not, however, adequately explain its decision that the Teleport/ASC proposal met the *criteria* of the transborder policy. In the first place, it did not confront the question whether a finding that Intelsat service would be uneconomical could be based solely on a price comparison, or whether—in light of the protectionist policy in favor of Intelsat embodied in applicable law and treaties—some qualitative difference (such as duplication of facilities or multiple satellite hops for service via Intelsat) is required. Second, the FCC totally failed to consider the argument presented by Comsat below that the Intelsat system could provide the service at a much lower price than the Commission believed. Finally, the Commission did not make it clear that the applicants had demonstrated impracticality on other grounds.

We therefore reverse the FCC's decision and remand to the Commission for reconsideration of these questions.

## I. BACKGROUND

### A. *Regulatory Background*

The legal framework for United States international satellite telecommunications policy is to be found in several documents. The Communications Satellite Act of 1962, 47 U.S.C. §§ 701 *et seq.* (1982), established Comsat, a private, for-profit corporation, as the vehicle for United States participation in the envisioned global system. The Act also declared the policy objective of cooperation with other countries in the development of this system. At the same time it left the door open for the creation of additional satellite systems "if required to meet unique governmental needs or if otherwise required in the national interest." 47 U.S. C. § 701(d). An interim international agreement was concluded in 1964[1] and subsequently superseded by a permanent "Intelsat Treaty."[2] The Intelsat Treaty provided notably, in its article XIV(d), that any party wishing to use non-Intelsat "space segment facilities" (*i.e.,* satellites) for international public telecommunications services must undertake a consultation process with Intelsat to ensure (a) that the proposed arrangement was technically compatible with Intelsat facilities, and (b) that it would not create "significant economic harm to the global system of INTELSAT."

The Intelsat Treaty also provided, in article V(d), that "[t]he rates of space segment utilization charge for each type of utilization shall be the same for all applicants for space segment capacity for that type of utilization." Intelsat is thus obligated to charge a uniform rate for the same service provided on any of its routes, even though traffic on certain routes is much heavier, and therefore more profitable, than on others.[3] The effect of these "globally aver-

---

1. Agreement Establishing Interim Arrangements for a Global Commercial Communications Satellite System, Aug. 20, 1964, 15 U.S.T. 1705, T.I.A.S. No. 5646.

2. Agreement Relating to the International Telecommunications Satellite Organization "Intelsat," Aug. 20, 1971, 23 U.S.T. 3813, T.I.A.S. No. 7532.

3. In 1985, Congress directed the Executive

aged rates" has been to provide a subsidy for service to the less developed countries. *See* Caplan, *The Case For and Against Private International Communications Satellite Systems*, 26 JURIMETRICS J. 180, 187, 194–95 (1986). This arrangement is consistent with Congress' policy declaration in the Communications Satellite Act, which mandated that in developing the new international telecommunications services, "care and attention will be directed toward providing such services to economically less developed countries and areas as well as those more highly developed...." 47 U.S.C. § 701(b). It makes it difficult, however, for Intelsat to compete effectively on the most lucrative routes with any private system that is free to offer service only on those routes. *See* Caplan, *supra*, at 194.

Since 1981, the FCC has developed two exceptions to the general rule that all international satellite communications are to be carried by the Intelsat system. The first is the "transborder policy," under which the Commission has allowed the use of existing domestic satellites for the provision of service on an incidental basis to foreign points within the satellite's footprint. When applications to provide such service were first made, an interagency task force in the Executive Branch studied the issue to determine compatibility with United States obligations under the Intelsat Treaty. Its conclusions were stated in a July 1981 letter from Undersecretary of State James L. Buckley to FCC Chairman Mark Fowler.[4] The "Buckley Letter" attempted to give content to the statutory provision that "additional" satellite systems were not precluded "if otherwise required in the national interest." 47 U.S.C. § 701(d). It explained that

> [c]ertain exceptional circumstances may exist where it would be in the interest of the United States to use domestic satellites for public international telecommunications with nearby countries. One such case would be where the global

system could not provide the service required. Another case would be where the service planned would be clearly uneconomical or impractical using the INTELSAT system.... [T]he burden of proof for demonstrating that sound technical, operational or economic reasons warrant reliance on domestic satellites for international purposes must rest with proponents of such use.

88 F.C.C.2d at 288. In cases such as these, the letter continued, the State Department would be prepared to initiate the consultation process required under article XIV(d) of the Intelsat Treaty.

The first set of transborder applications, conditionally approved by the FCC in October 1981, involved two types of projects. One was the provision of U.S. television programming, already being carried on domestic satellites, to receive-only earth stations in Canada, Central America and the Caribbean. *Transborder Satellite Video Services ("Transborder I")*, 88 F.C.C.2d 258 (1981). The other was the extension of private U.S. two-way communications networks (such as corporate communications systems) to locations in Canada. *American Satellite Co.*, 88 F.C.C.2d 178 (1981); *Satellite Business Sys.*, 88 F.C.C.2d 195 (1981). In both cases, use of the Intelsat system for the requested service extension would have necessitated using a second satellite and a second transmit earth station. The Commission expressly relied upon the Buckley Letter as its guide. Applying the Letter's criteria, it found that while Intelsat was technically able to provide the services in question, it would be uneconomical and impractical for it to do so. *Transborder I*, 88 F.C.C.2d at 272–73, 279–82; *American Satellite Co.*, 88 F.C.C. 2d at 182–83, 187–90; *Satellite Business Sys.*, 88 F.C.C.2d at 199–200, 205–08. The Commission has now approved "well over one hundred" transborder applications.

Branch to work toward an amendment of article V(d) to permit Intelsat to establish cost-based rates on some routes. *See* 1986–87 Foreign Relations Authorization Act, Pub.L. No. 99–93, § 146(c), 99 Stat. 405, 425–26 (1985).

4. Letter from James L. Buckley to Mark Fowler (July 23, 1981) ("Buckley Letter"), *reprinted in Transborder Satellite Video Services*, 88 F.C.C.2d 258, 287–89 (1981).

*Teleport Int'l Ltd. & American Satellite Co.,* 1 F.C.C.Rcd. 101, 103 (1986).

The second exception to the use of Intelsat for international communications is the more recent "separate systems" policy. This policy was developed in 1984 in response to proposals for the construction of non-Intelsat satellite systems specifically for international service. Following a Presidential Determination "that separate international communications satellite systems are required in the national interest," [5] the Secretaries of State and Commerce, pursuant to the President's instructions, asked the FCC to restrict such separate systems authorizations to private-line systems "not interconnected with public-switched message networks." [6] This restriction was deemed necessary to protect the economic viability of the Intelsat system, whose core business was public-switched communications. The Commission, while approving the concept of separate systems, adopted this restriction in *Establishment of Satellite Systems Providing International Communications,* 101 F.C.C.2d 1046 (1985).

Soon after the separate systems policy was adopted, Congress undertook to write it into law as part of the 1986–87 Foreign Relations Authorization Act ("FRAA"), Pub.L. No. 99–93, § 146, 99 Stat. 405, 425–26 (1985). This enactment specified that it was U.S. policy to promote separate systems as long as they were technically compatible with Intelsat and avoided "significant economic harm" to its system, *id.,* § 146(a), and as long as they complied with the Executive Branch conditions established pursuant to the Presidential Determination—*i.e.,* the limitation to non-public-switched systems. *Id.,* § 146(b)(1). In its definitional section, the legislation defined "separate system" so as to exclude the kind of proposals the Commission had considered under its transborder policy. The term "separate system," it stated, "shall not include any satellite or system of satellites established—(1) primarily for domestic telecommunications purposes and which incidentally provides services on an ancillary basis to points outside the jurisdiction of the United States but within the western hemisphere...." *Id.,* § 146(g).

## B. *The Present Application*

The application in the present case is part of a plan to move jobs in information delivery services offshore to Jamaica. Teleport and ASC propose to lease private lines to U.S. businesses for voice, data and video services, thus permitting the employment of Jamaican labor for services such as remote data entry, electronic transcription services, electronic document distribution, video teleconferencing, telemarketing, reservation services, specialized non-switched voice services, and database upkeep, manipulation and maintenance. *See* Brief for Respondents at 14 n. 41. Since "a word processor or data entry worker in the United States is paid eight times more than a similar worker in Jamaica," Teleport/ASC Reply Comments at 9 n. 4, Appendix ("App.") 54, it appears that the lower cost of Jamaican labor would more than offset the communication costs. Teleport plans initially to lease 400 circuits between the United States and Jamaica via an ASC domestic satellite, half of them from New York and half from Atlanta. Expansion of the system to provide service to other U.S. cities is contemplated for the future.

In their comments below, Teleport and ASC argued that their proposal was consistent with previous transborder decisions. Intelsat's system, they stated, would not be technically capable of serving customers in the western part of the United States (when the system expanded there), and in any case could not provide service sufficiently economically to make the program viable. They also argued that since the communications traffic would be newly

**5.** Presidential Determination No. 85–2 (Nov. 28, 1984), 49 Fed.Reg. 46,987, *reprinted in Establishment of Satellite Systems Providing International Communications,* 100 F.C.C.2d 290, 314 (1985).

**6.** Letter from Secretary of State and Secretary of Commerce to Mark S. Fowler (Nov. 28, 1984), *reprinted in Establishment of Satellite Systems Providing International Communications,* 100 F.C.C.2d 290, 315–16 (1985).

generated, it would entail no loss of revenue to the Intelsat system. Teleport/ASC Application, App. 1–15; Teleport/ASC Reply Comments, App. 44–64. The Teleport/ASC application was supported by the Government of Jamaica, which pointed to the new jobs and government revenue the project would bring, Comments of the Government of Jamaica, App. 37–41, and by the National Telecommunications and Information Administration ("NTIA"), a Commerce Department entity which is the Executive Branch agency principally charged with the development of telecommunications policy. NTIA argued that the application would further the President's Caribbean Basin Initiative and U.S. foreign policy interests generally. Comments of the NTIA, App. 67–71. Comsat, on the other hand, petitioned the FCC to deny the application, arguing that it was a major departure from previous transborder approvals and in any case failed to meet the Buckley Letter's criteria. Comsat also suggested that the proposal might violate the separate systems policy, because there were indications that its service would be connected to public-switched networks. Comsat Petition to Deny, App. 20–27; Comsat Reply, App. 72–90.[7]

On October 9, 1986, the FCC conditionally granted the Teleport/ASC application. *Teleport Int'l Ltd. & American Satellite Co. ("Teleport/ASC")*, 1 F.C.C.Rcd. 101 (1986). Noting that the proposal had the support of both the Government of Jamaica and the U.S. Executive Branch, the Commission found that the application fell within the scope of the transborder policy because its proposed service was within the footprint of a domestic satellite. The proposed service was "not radically different" from transborder services approved for Canada and Mexico, and the fact that Jamaica was not contiguous to the United States was of no consequence as long as it fell within the domestic satellite's footprint. The fact that no two-way service had ever been approved to Caribbean locations simply reflected the fact that none had ever been considered by the Commission. *Id.* at 103–04. The FCC also rejected Comsat's argument that the proposal violated the separate systems policy's ban on access to public-switched networks. The separate systems policy, the Commission stated, had not been intended to change the transborder policy in any way; moreover, the separate systems policy dealt with the construction of separate international satellite systems and therefore had no application to a request to use a domestic satellite for specialized international service within its footprint. *Id.* at 104.

Evaluating the proposal under the Buckley Letter's criteria, the FCC first determined that Intelsat was capable of providing the service. *Id.* The Commission found, however, that service by Intelsat would be "clearly uneconomical and impractical." It determined that Intelsat service would cost at least $1,560 per month for each circuit, which was far greater than the monthly charge of $575 "cited by the applicants." This cost disparity made use of the Intelsat system "clearly uneconomical." Moreover, as the Teleport/ASC project was based on the low cost of Jamaican labor, using Intelsat service would make it prohibitively expensive. The Commission also found that earth stations for Intelsat's IBS service [8] were not yet authorized for all of the western U.S. cities to which Teleport/ASC ultimately intended to provide service; thus, serving those locations via Intelsat would require a domestic satellite hop or the use of terrestrial lines, making use of Intelsat "clearly uneconomical and impractical." *Id.*[9]

---

7. American Telephone and Telegraph Company ("AT & T") also filed comments expressing reservations about the possibility that the Teleport services would be connected to public-switched networks. Comments of AT & T, App. 30–32.

8. IBS is Intelsat's private-line business service, which has been offered since 1984.

9. The Commission also stated that use of the Intelsat system would require ASC either to use other carriers' Intelsat-compatible earth stations—which would destroy the "context of a total system"—or use its own Intelsat-compatible facility in Washington, D.C., thus requiring significant use of terrestrial lines or an extra satellite hop in order to reach the earth station. *Id.*

Finding that the Teleport/ASC proposal met the criteria of the Buckley Letter for transborder service, the Commission conditionally granted the application, pending the completion of the Intelsat consultation process required under Article XIV(d) of the Intelsat Treaty. *Id.* at 105. In April 1987, Intelsat determined that the proposal was technically compatible with its system and would not cause significant economic harm to the Intelsat system. The FCC thereupon issued a final authorization to Teleport and ASC. *Teleport Int'l Ltd. & American Satellite Co.,* 2 F.C.C.Rcd. 4149 (1987). Comsat petitioned this court for review of the Commission's order.

## II. ANALYSIS

Comsat argues on appeal that the FCC's approval of the Teleport/ASC application was arbitrary and capricious because it was an unexplained departure from the Commission's prior practice. In particular, Comsat suggests that the Teleport/ASC project does not fall within the class of applications previously considered under the transborder policy; that in any case it did not meet the criteria the Commission has applied when it has considered applications under that policy; and that the application should have been considered and rejected under the separate systems policy.

In considering Comsat's challenge, we are constrained by the "arbitrary and capricious" standard of review. The Supreme Court has defined the standard, as follows:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman*

*Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* [419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)]; *Citizens to Preserve Overton Park v. Volpe,* [401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)]. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. *SEC v. Chenery Corp.,* 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc., supra,* [419 U.S.] at 286 [95 S.Ct. at 442]. See also *Camp v. Pitts,* 411 U.S. 138, 142–143 [93 S.Ct. 1241, 1244, 36 L.Ed.2d 106] (1973) (*per curiam*).

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). If, as Comsat asserts, the FCC has departed from established policy, then we must determine whether the agency has acted pursuant to "reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

In applying the arbitrary and capricious standard in this case, we rely on the Commission's prior decisions and on the Buckley Letter. The legal significance of the latter derives from its explicit adoption by the Commission as its guide in evaluating

transborder applications.[10] All parties agree that the Buckley Letter has been embraced by the FCC as the basis for its transborder policy, and that transborder applications are therefore to be judged by its principles. *See* Brief of Petitioner at 8, 33; Brief for Respondents at 7–8. Indeed, the FCC explicitly stated in this case that it was "[a]pplying the criteria of the Buckley letter." 1 F.C.C.Rcd. at 104.

A. *The Scope of the Transborder Policy*

■ We turn first to the question whether the Teleport/ASC application was properly considered under the transborder policy, and whether the Commission's more recently adopted separate systems policy should have any bearing on its consideration.

The scope of the transborder policy has never been precisely defined. Rather, it must be inferred from the Buckley Letter and the Commission's prior decisions. The Buckley Letter gives only two clues to any limitation on the policy's scope: it refers to the use of "domestic satellites" and to service to "nearby countries." 88 F.C.C.2d at 288. Thus, any further limitation on the scope of the transborder policy must be found in the Commission's decisions.

The present decision goes beyond previously approved transborder proposals by approving two-way service to a location other than Canada or Mexico. Except for those two countries, all previous transborder approvals had been for one-way service (principally television transmissions) "which can be received as a by-product of a

primary U.S. domestic transmission." *Teleport/ASC,* 1 F.C.C.Rcd. at 103. The Commission had approved service to Canada and Mexico, however, that involved "use of a domestic satellite for private-line communications for the provision of specialized two-way data communications," including "specialized video services . . . unrelated to any domestic component." *Id.* The fact that such two-way service had never before been approved for the Caribbean countries is apparently due simply to the fact that "[n]o two-way service between the U.S. and Caribbean locations has ever been considered by the Commission." *Id.* at 104.[11]

The fact that the proposed service goes beyond the precise factual circumstances of what had previously been approved does not necessarily mean that it is a departure from previous policy. We see no reason to conclude that applying the transborder policy to the Teleport/ASC proposal is inconsistent with that policy's rationale. We have found no indication that the FCC has ever rejected any application for service within a domestic satellite's footprint, on the basis that such service was outside the scope of the transborder policy.[12] Nor has the FCC ever stated that the transborder policy was more restrictive than it now interprets it to be.

Comsat's argument to the contrary boils down to the assertion that the transborder policy applies only to service that is "incidental . . . to domestic services already being carried on domestic satellites." Brief of Petitioner at 25. This argument does

10. *See Transborder I,* 88 F.C.C.2d at 272–73, 279–82; *American Satellite Co.,* 88 F.C.C.2d at 182–83, 187–90; *Satellite Business Sys.,* 88 F.C.C. 2d at 199–200, 205–08.

11. Comsat argues that Canada and Mexico should not be considered precedents for non-contiguous countries, because historically all transmissions between the U.S. and Canada and Mexico had been carried by terrestrial lines and would thus not be carried by the Intelsat system in any case. Reply Brief of Petitioner at 6. Comsat admits, however, that the Commission has never stated any policy limiting two-way service to Canada and Mexico, *id.* at 6 n. 17, and Comsat has pointed to no other evidence that this circumstance has ever been thought to imply a limitation on the scope of the transborder

policy. In its decision below, the Commission did take note of this factor and rightly stated that it was "not directly germane to the question of whether these services meet our Transborder criteria." Rather, the fact that service to Canada and Mexico had traditionally been carried over terrestrial lines went to the question of economic harm to Intelsat, and thus was relevant mainly in the context of the article XIV(d) consultation process. 1 F.C.C.Rcd. at 104.

12. The Commission has rejected applications which would have required that the domestic satellite be modified in order for the proposed service to fall within its footprint. *See RCA American Communications, Inc.,* 101 F.C.C.2d 1342 (1985).

not withstand scrutiny. Comsat points, *id.* at 30–31, to the statement in most of the transborder cases that the proposals under consideration "generally involve only the incremental expansion of existing domestic satellite services or networks rather than the introduction of new international services." *E.g., American Tel. & Tel. Co. ("Transborder III"),* File No. I–P–C–82–048, Mimeo. No. 6119, ¶ 50 (FCC Aug. 26, 1983), *reprinted in* Supplemental Appendix ("S.A.") 55, 73. The key to this boilerplate passage is the word "generally." Several of the applications [13] approved in *Transborder III,* for example, were in fact for "all forms of private-line services," *id.,* ¶ 47, S.A. 71, a phrase that would certainly seem to encompass the present application.

In fact, when the Commission uses the term "incidental," it does so in a context that supports the interpretation that transborder service must be incidental to a domestic *satellite,* rather than incidental to a domestic *service.* In one case, for example, the FCC said in regard to domestic satellites: "We continue to view *the use of these satellites* for transborder services to Canada and points in the Caribbean, Central and South America *as an incidental or secondary use." Western Union Tel. Co. ("Transborder V"),* File No. I–T–C–83–068, Mimeo No. 3286, ¶ 32 (FCC Apr. 4, 1984) (emphasis added), *reprinted in* S.A. 98, 118.[14]

Comsat's "incidental to service" understanding of the *scope* of the transborder policy would, moreover, render the *content* of that policy meaningless. If the only proposals to be considered under the transborder policy were those that were incidental to existing domestic service, it is hard to imagine that the FCC could ever find Intelsat service to be anything other than "uneconomical and impractical"—for if the service were already being provided domestically, extending it to another country could inevitably be done without the duplication of facilities or multiple hops that would be necessary for Intelsat to provide the service. Only in the case of some new service would the possibility arise that Intelsat service might *not* be uneconomical or impractical by comparison to the use of a domestic satellite. Thus, the question whether the proposed service is incidental to an existing service is meaningful not in determining whether the proposal falls within the *scope* of the transborder policy, but only in ascertaining whether it meets the *criteria* of that policy, namely the conditions articulated in the Buckley Letter.[15]

We conclude that the FCC's understanding that the transborder policy can be applied where the proposed service is incidental to a domestic satellite (but not necessarily incidental to an existing domestic service) is not an unfair reading of the Commission's own policy and past practice.[16] Thus, it was not arbitrary and capri-

---

**13.** The transborder cases are typically consolidated decisions on numerous applications from various companies.

**14.** *See also Western Union Tel. Co.,* File No. 1144–DSS–P/LA–84, Mimeo No. 6929, ¶ 11 (FCC Sept. 11, 1985) ("We have made clear that the primary use of domestic satellites is for domestic service and that any use of these satellite[s] for service to Canada, Mexico, the Caribbean, or Central and South America should be viewed as incidental or secondary."), *reprinted in* Reply Brief of Petitioner, addendum.

**15.** *See RCA American Communications, Inc.,* File No. I–T–C–84–169, Mimeo No. 3490, ¶ 4 (FCC Mar. 29, 1985), where the FCC used the term "incidental to service" in just this sense. The Commission observed that the proposed service "would be incidental to the service provided domestically. Thus, it would be uneconomical or impractical to use the INTELSAT

system for the service. We therefore find that RCA's request to be [sic] consistent with our transborder guidelines...."

**16.** We are aware that the terms "incidental" and "ancillary" also appear in Congress' definition of transborder services in the 1986–87 Foreign Relations Authorization Act. Even assuming that this legislative definition is of some relevance to the question before us, it is of no help to Comsat, for it points in the same direction as the foregoing analysis. The language in question specifies that the term "separate system" shall not apply to "any satellite or system of satellites established—(1) primarily for domestic telecommunications purposes and which incidentally provides services on an ancillary basis to points outside the jurisdiction of the United States but within the western hemisphere...." Pub.L. No. 99–93, § 146(g), 99 Stat. at 426. Clearly, what this provision describes is the incidental use of a domestic satel-

cious for the FCC to evaluate the present application under the criteria of the transborder policy.

This conclusion is in no way called into question by the FCC's separate systems policy. The Commission pointed out in its decision below that "the *Separate Systems* decisions was [sic] not intended to change Transborder policy in any way." 1 F.C.C. Rcd. at 104. Comsat concedes this point. Brief of Petitioner at 43. And the FRAA clearly excludes transborder cases from its definition of separate systems. Pub.L. No. 99–93, § 146(g), 99 Stat. at 426. In any case, the basic documents on which the separate systems policy is based make clear that what is at issue there is *systems of satellites.* Both Presidential Determination 85–2 and the letter of the Secretaries of State and Commerce speak of "separate international communications satellite systems." [17] The separate systems policy was developed to deal with proposals for the construction of non-Intelsat satellite systems devoted to international service. As there is no question of such systems in the Teleport/ASC proposal, the separate systems policy has no application to this case.

B.  *Application of the Buckley Criteria*

■  The Buckley Letter, it will be recalled, established that the use of domestic satellites for international communications could be justified under two "exceptional circumstances." The first consisted of cases where Intelsat could not provide the requested service. The second embraced situations where service via the Intelsat system would be "clearly uneconomical or

impractical." 88 F.C.C.2d at 288. The Letter also specified that the burden of proof for demonstrating that these criteria were met rested with the proponent of the transborder service. *Id.*

The Commission rejected the argument of Teleport and ASC that Intelsat would be incapable of providing the service. It found that Intelsat's satellite located at 307°, which carries Intelsat's IBS service, could provide the service Teleport and ASC proposed. 1 F.C.C.Rcd. at 104.[18] Thus, the only question is whether the FCC was justified in determining that Intelsat service would be "uneconomical or impractical."

On this point, we find that the Commission's explanation of its conclusion fails to satisfy the "arbitrary and capricious" standard. First, the Commission provided no explanation for its decision to base a finding of "uneconomical" solely on comparative price data. This decision requires an explanation, both because it is a departure from prior practice and because it makes no sense in light of the clear purpose of all applicable statutes and treaties to shield Intelsat from price competition. Second, even if comparative price data is a sufficient basis for this determination, the FCC totally failed to consider the claim advanced by Comsat below that Intelsat could provide the service at a much lower price than that cited by the Commission. Finally, it is not clear from the FCC's opinion that the applicants have shown how Intelsat service would be impractical on grounds other than price. These shortcomings are particularly troubling because the

---

lite for international services, not international service incidental to domestic service. If, as Comsat argues, the FRAA "reflect[s] and embod[ies] the essential criteria that had been applied by the Commission in all transborder decisions until the present case," Brief of Petitioner at 30, then it provides additional support for the FCC's position that its consideration of the present application under the transborder policy represents no departure from precedent.

17.  *See* 100 F.C.C.2d at 314–16.

18.  The FCC recognized that "an optimum look angle" might not be available for service to the west coast, and that supplemental equipment might therefore be necessary. This considera-

tion, it stated, was relevant not to technical feasibility but rather to the economic feasibility of the enterprise. *Id.* The Commission did not, however, refer to this factor in its discussion of whether Intelsat service would be uneconomical.

While Comsat asserted below that it and Intelsat stood ready to provide the service Teleport and ASC proposed, Comsat Petition to Deny at 3–5, App. 22–24; Comsat Reply at 5–9, App. 80–84, the record contains some evidence of Comsat reluctance to do so. *See* Affidavit of Mark G. Connell (July 21, 1986), App. 63–64. Whether, should the Teleport/ASC application ultimately be denied, Comsat could nonetheless decline to provide the service is a question we leave to the FCC to address in the first instance.

Buckley Letter places the burden on the *applicant* to show that Intelsat service would be uneconomical or impractical.

### 1. *Reliance on Comparative Prices*

We are troubled, first of all, by the FCC's apparent willingness to base a finding of "uneconomical" solely on the fact that Intelsat would charge a higher price for the service than would a domestic competitor. As we have seen, higher prices for international service are to some degree inherent in Intelsat's system of globally averaged rates, mandated under article V(d) of the Intelsat Treaty. Both that treaty and the Communications Satellite Act envisioned a regime under which Intelsat would be protected from full-scale competition in the interest of other, overriding goals, including promotion of world peace and understanding, provision of satellite communications technology to all nations, and most effective use of the limited frequency spectrum and the geostationary orbit. The Buckley Letter explicitly embraces these goals and the protected place of the Intelsat global system in U.S. satellite communications policy, even while permitting a limited exception to exclusive reliance on Intelsat for international satellite communications. *See* 88 F.C.C.2d at 287–88. The Commission's position seemingly would open the door to full-scale price competition between Intelsat and domestic satellite systems. The result would be that *any* international route that fell within a domestic satellite's footprint could gain approval under the transborder policy, as long as the applicant could offer a lower price than Intelsat. We are hard pressed to understand how such an outcome is compatible with the Buckley Letter, not to mention the Communications Satellite Act and the Intelsat Treaty.

What's more, the comparative-price approach appears to mark a significant departure from prior FCC practice. In earlier transborder cases, the Commission's findings of "uneconomical" have been based on determinations that use of the Intelsat system would require multiple satellite hops, additional terrestrial links, or duplication of facilities. In other words, the difference between the proposed service and possible Intelsat service always has involved a *qualitative* component.[19] This is clear in the three foundation cases of the transborder policy. *See Transborder I,* 88 F.C.C.2d at 280–81 (duplication of existing programming on a second network); *American Satellite Co.,* 88 F.C.C.2d at 189 (virtual duplication of the customer's network); *Satellite Business Sys.,* 88 F.C.C.2d at 206–07 (virtual duplication of the SBS system for each customer). It also emerges from the more than 100 transborder applications the FCC has granted. In its decision below, the Commission summarized the bases for its findings of "uneconomical" in those cases: Applications to extend video services to transborder points had been granted on the basis that use of Intelsat facilities would require multi-satellite hops and additional terrestrial facilities, and—by duplicating programming already available on domestic satellites—would be an inefficient use of the radio spectrum. In regard to business service applications, the findings of "uneconomical" were based on the necessity of duplicating networks already in place, the necessity of multi-satellite hops and terrestrial links to reach customers, and the inefficient use of the radio spectrum.[20] Here, by contrast, the

---

**19.** The FCC does not seriously dispute this point. *See* Brief for Respondents at 32–33.

**20.** 1 F.C.C.Rcd. at 103; *see Eastern Microwave, Inc.* ("*Transborder II*"), File No. I–P–C–81–049, Mimeo No. 2617, ¶¶ 41–42 (FCC Mar. 1, 1983), *reprinted in* S.A. 36, 49–51; *American Tel. & Tel. Co.* ("*Transborder III*"), File No. I–P–C–82–048, Mimeo No. 6119, ¶¶ 45–46 (FCC Aug. 26, 1983), *reprinted in* S.A. 55, 70–71; *Bonneville Satellite Corp.* ("*Transborder IV*"), File No. I–T–C–83–148, Mimeo No. 1554, ¶¶ 40–42 (FCC Dec. 29, 1983), *reprinted in* S.A. 76, 90–92; *Western Un-*

*ion Tel. Co.* ("*Transborder V*"), File No. I–T–C–83–068, Mimeo No. 3286, ¶ 25 (FCC Apr. 4, 1984), *reprinted in* S.A. 98, 114–15; *Eastern Microwave, Inc.* ("*Transborder VI*"), File No. I–T–C–84–095, Mimeo No. 6425, ¶¶ 15–16 (FCC Sept. 11, 1984), *reprinted in* S.A. 121, 130–31; *RCA American Communications, Inc.,* File No. I–T–C–84–169, Mimeo No. 3490, ¶ 4 (FCC Mar. 29, 1985) (finding of uneconomical or impractical based on proposed service being incidental to domestic service); *Western Union Tel. Co.* ("*Transborder VII*"), File No. I–T–C–83–136,

proposed service appears to be an entirely new one which could be carried *either* by the Intelsat system *or* by domestic facilities, without any duplication.

In view of the protectionist purpose embodied in the Communications Satellite Act, the Intelsat Treaty and the Buckley Letter, and because the FCC departed from its prior practice without providing a reasoned explanation, we find it necessary to remand this case for further consideration by the Commission. On remand, the FCC should squarely address the issue of whether a finding that Intelsat service is "uneconomical" can be based on a price comparison alone. The Commission's conclusion must, of course, be based on a reasoned analysis of the relevant documents.[21]

### 2. *Comsat's Price Data*

Even if we were to assume that a finding of "uneconomical" could be based on comparative price data, we would find it necessary to remand to the Commission because of its total failure, in weighing the cost of ASC and Intelsat service, to consider Comsat's argument that it could provide the service at a significantly lower price than that assumed by the Commission.

The Commission, on the basis of Comsat's estimated monthly cost of $780 per IBS half circuit, and assuming a similar charge for the Jamaican end, found that the monthly charge for a circuit via the

Intelsat system would be $1,560. This figure, it stated, would be more than two and one-half times greater than the monthly charge of $575 "cited by the applicants."[22] 1 F.C.C.Rcd. at 104. The FCC totally ignored, however, Comsat's representation that the IBS circuits could be multiplexed to derive up to five "voice grade circuits," with the result that the actual monthly cost per channel would be about $312 rather than $1,560. Comsat Reply at 8, App. 83.

At oral argument, counsel for the FCC conceded that the Commission had not addressed Comsat's argument about the possibility of multiplexing.[23] He also agreed that if Intelsat service could indeed be provided for $312, this would be dispositive of the case. In its defense, the FCC states that it was under no obligation to consider a comment advanced in "a single, cryptic, unsupported sentence," and that this was not the kind of "significant" comment it need consider. Brief for Respondents at 34 n. 76. We cannot agree. The fact that Comsat's representation, if true, would in itself be dispositive of the case should suffice to make it a "significant" comment demanding consideration. Moreover, the comment's brevity does not distinguish it from the representation made by Teleport and ASC as to the price they would offer, and it is, if anything, less "cryptic" than the Teleport/ASC representation, which the Commission had no difficulty in credit-

136A, Mimeo No. 3643, ¶¶ 14–15 (FCC Apr. 8, 1985), *reprinted in* S.A. 146, 152–54; *American Satellite Co.* (*"Transborder VIII"*), File No. I–T–C–85–187, Mimeo No. 7299, ¶ 17 (FCC Sept. 30, 1985), *reprinted in* S.A. 175, 182–83; *RCA American Communications, Inc.* (*"Transborder IX"*), File No. I–T–C–86–002, Mimeo No. 2578, ¶ 10 (FCC Feb. 14, 1986), *reprinted in* S.A. 191, 196.

**21.** We note that there is some interest in this country in amending the Intelsat Treaty to permit Intelsat to compete effectively on the more lucrative routes. *See* FRAA, Pub.L. No. 99–93, § 146(c), 99 Stat. at 425–26. The Commission is of course free to take into account the possibility of such change in the Intelsat regime.

**22.** Comsat points out that Teleport and ASC never represented to the Commission that their rate for the proposed service would be $575; rather, they merely cited this as the existing domestic rate from New York to Atlanta and stated that their service would offer rates com-

parable to those in the domestic market. Brief of Petitioner at 37–38; *see* Teleport/ASC Reply Comments at 10, App. 55. This representation would appear to be sufficient to provide an approximation of the rate Teleport and ASC would charge; however, we will leave this matter for resolution by the Commission on remand.

**23.** The Commission's brief to this court did contain some substantive rebuttal of Comsat's multiplexing argument. Brief for Respondents at 34 n. 76. But it is elementary that post-hoc rationalization by appellate counsel is no substitute for actual consideration by the Commission. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962). The arguments advanced by counsel are, of course, of the kind the Commission should consider on remand.

ing.[24] Finally, the Buckley Letter specifically directs the Commission to credit information provided by Comsat about the conditions under which Intelsat service could be supplied: "The U.S. Signatory, the Communications Satellite Corporation (COMSAT), can supply the Commission with information on the ability of the global system to provide the required service...." 88 F.C.C.2d at 288.

On remand, if it reaches this issue, the Commission must revisit its determination of the relative costs of the two systems, giving due consideration to the argument advanced by Comsat that Intelsat service could be provided at a rate much lower than that assumed by the Commission.

### 3. *Impractical on Other Grounds*

Should the FCC conclude on remand that a finding of "uneconomical" requires more than a price comparison, it may then consider whether the applicant has carried its burden of showing other grounds for a finding that Intelsat service would be "uneconomical or impractical." It could carry this burden, for example, by showing that the Intelsat system could not provide the service in question in its entirety and without duplication of facilities, and that the domestic satellite system could more nearly do so. In the present context, the issue appears to turn on the locations of the two systems' earth stations.

It is undisputed that both ASC and Intelsat's IBS earth stations exist in the two locations from which Teleport and ASC intend to begin service, New York and Atlanta. It is not clear from the record how firm the applicants' plans are to expand to other cities, when they would do so, to what cities they would expand, and in which cities ASC earth station facilities currently exist or are under construction.[25] According to Comsat's comments below, thirteen IBS earth stations are currently available and seven more are planned in various cities, but the record does not disclose their location or when they will become operational.[26] On the record presented to us, we are unable to evaluate the accuracy of the Commission's finding that, because "use of the [ASC] National Network would involve facilities already in place, whereas IBS earth stations are not currently authorized for every western U.S. location involved in the TI/ASC proposal," use of the Intelsat system for some planned service locations "would require the use of terrestrial facilities or the use of a domestic satellite hop." 1 F.C.C.Rcd. at 104.

Furthermore, it would appear from the fragmentary record that ASC has a network of existing or planned earth stations in a number of U.S. cities, and that Intelsat IBS earth stations also exist or are planned in a comparable number of U.S. cities. While the two networks are partially overlapping, we gather that each has earth stations in some cities where the other has none.[27] Thus, either system could provide service without use of terrestrial facilities or additional satellite hops to certain cities but not to others. In a case such as this, it would appear that there is no significant difference between what the applicant has proposed and what Comsat claims to be in a position to offer. A different problem might be posed if the Intelsat network

---

24. *Compare* Comsat Reply at 8, App. 83, *with* Teleport/ASC Reply Comments at 10, App. 55. Both the Teleport/ASC and Comsat comments were supported by affidavits.

25. The Teleport/ASC application states that service will be provided "eventually" to Miami, Phoenix, Chicago, San Francisco and Los Angeles, in addition to New York and Atlanta. Teleport/ASC Application at 4, App. 4. A map attached as Appendix I shows, in addition to these cities, Washington, St. Louis, Denver and Seattle, and states that "[a]s demand develops, users in these cities will be connected to the Teleport International facility in Jamaica." *Id.,*

appendix I, App. 14. The applicants' Reply Comments refer to plans to integrate the Jamaican earth station into the ASC National Network, which "provides access to shared user earth stations, in fifteen major metropolitan areas, which either presently exist or are under construction." Teleport/ASC Reply Comments at 12, App. 57.

26. *See* Comsat Reply at 6, App. 81. In addition, the record gives no indication of when the ASC earth station in Jamaica would be available.

27. *See* Brief of Petitioner at 35–36.

were significantly less extensive than the ASC system, or if there were some indication of particular demand for the proposed service in cities where ASC but not Intelsat had earth station facilities. But, at least on the present record, no such circumstances are presented.

We reject *a fortiori* the Commission's suggestion that a finding of "uneconomical or impractical" could be based on the fact that use of Intelsat would require ASC to use other carriers' IBS-compatible earth stations, thus destroying the "context of a total system." 1 F.C.C.Rcd. at 104. The relevant question under the Buckley Letter is whether the service could be provided via Intelsat—*not* whether ASC could provide the service via Intelsat. If the FCC means to suggest that the service would be uneconomical or impractical outside the "context of a total system" operated by one carrier, it must point to evidence that Teleport and ASC have adduced to carry their burden of demonstrating this circumstance.[28]

### CONCLUSION

While the FCC correctly considered the Teleport/ASC application under the transborder policy, it failed to explain adequately its decision that a finding of "uneconomical" could be based solely on comparative price data. Its findings that Intelsat service would be far more expensive and that it would be impractical on other grounds are not supported by "reasoned analysis." We therefore vacate the Commission's order granting the Teleport/ASC application and remand for further proceedings consistent with this opinion.

*So ordered.*

SILBERMAN, Circuit Judge, concurring:

I write separately only to emphasize what I understand to be the limitations of section II.B.1. of the majority opinion. The FCC's memorandum opinion is somewhat ambiguous respecting why the FCC regards Intelsat's proposal as "uneconom-

ical." The FCC's opinion might be read, as the majority does, to suggest that a mere price differential between Intelsat's proposal and that of its would-be competitors would justify granting the application. If that were so then I would agree with the majority that the FCC would have great difficulty in squaring that position with its prior precedent. If, on the other hand, the FCC's decision were based, as at one point it suggests, on a finding that "use of the INTELSAT system would significantly raise the cost of service *to the point of being prohibitive,*" that position would seem legitimately based on prior precedent. 1 F.C.C.Rcd at 104 (1986) (emphasis added). In *Transborder I,* for example, the FCC said:

> Once the service is duplicated on the INTELSAT satellite and terrestrial links or multi-hop satellite connections are required to reach the transborder locations, *the cost of service will be increased significantly....* Therefore, *it is doubtful that U.S. programmers would be willing* to duplicate their networks over the INTELSAT system or whether the transborder customers could pay the added costs of service over INTELSAT facilities.

88 F.C.C.2d at 280–81 (emphasis added); *see also Transborder II* ¶ 42, *reprinted in* S.A. 50–51; *Transborder IV* ¶ 42, *reprinted in* S.A. 92. Such a standard would fully serve any FCC policy of protecting Intelsat, since it gives to other carriers only business Intelsat could never capture.

If the FCC indeed understands the use of Intelsat to be uneconomical only when the cost of that use is so substantial that it would prevent the proposed activity from going forward, I assume that any of a range of reasons could support a ruling of uneconomical. We certainly have not been presented with arguments to support the proposition, nor do I understand the majority to hold, that any particular reasons are more credible or noteworthy than others. In that regard, concepts of pure price and

---

**28.** Absent any concrete evidence that use of other carriers' IBS earth stations would be impractical, we have no reason to consider the Commission's alternative scenario that ASC route all of the traffic through its own IBS-compatible earth station in Washington, D.C.

qualitative cost converge; the obvious significance of qualitative design differences is that they add costs and therefore raise the price of service. As the FCC has noted, "the use of multi-satellite hops, terrestrial facilities and collocated domestic and international earth stations *would increase measurably the cost* of providing transborder satellite service." *Transborder I,* 88 F.C.C.2d at 280 (emphasis added). The Buckley letter, furthermore, would allow the use of domestic satellites for international telecommunications when use of Intelsat would be either "uneconomical" *or* "impractical." If the two criteria are distinct—which I doubt—the former would seem to address pure price differentials and the latter qualitative concerns.

The FCC, however, is less than crystal clear here as to exactly what it means by uneconomical, and since I fully agree with the majority that the agency improperly failed to consider Comsat's claimed lower price, I hope that the FCC will on remand clarify its position.